Harold Gene WEATHERLY, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–84–798.

Court of Criminal Appeals of Oklahoma.

Feb. 25, 1987.

Rehearing Denied April 6, 1987.

1332

Gloyd McCoy, Asst. Appellant Public Defender, Norman, for appellant.

Michael C. Turpen, Atty. Gen., Susan Stewart Dickerson, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

PARKS, Judge:

Harold Gene Weatherly, the appellant herein, was convicted by a jury in the District Court of Oklahoma County, Case No. CRF–84–1101, for two counts of Assault and Battery with a Deadly Weapon with Intent to Kill. Punishment was assessed at twenty (20) years imprisonment on each count. The trial court imposed judgment and sentence in accordance with the jury's verdict and ordered that the sentences be served consecutively. We affirm.

The facts of this case reveal a criminal episode that was most brutal and reprehensible. On January 10, 1984, Ester Moctezuma got off work at the Moore Christian Pre-School, and drove to her father's home in southeast Oklahoma City. At around 4:00 p.m. she was talking to her mother on the telephone when the doorbell rang. She hung up the phone and went to the door where she saw the appellant, who explained his truck had broken down and asked if he could use the telephone. Ms.

Moctezuma agreed and led him to a telephone in the kitchen. As appellant made his telephone call, Ms. Moctezuma walked to a desk and began looking at some mail. Suddenly she was attacked by the appellant, who had a knife. He began stabbing her in the shoulder, and his stabs to the chest and stomach knocked Ms. Moctezuma off her feet. Finally, the appellant stopped stabbing her, and Ms. Moctezuma fainted.

When she regained consciousness, Ms. Moctezuma went to the telephone to call for help. The appellant suddenly appeared, cut the wire to the telephone, and stabbed her hand. He then stabbed her repeatedly on the legs and sides until she again lost consciousness.

When she awoke a second time, Ms. Moctezuma remembered that the phone line had been cut, and went outside to seek help. She had been stabbed so many times that she had to hold her internal organs in her body with her arms. She found that she was unable to yell. She staggered back into the house and went to the hall phone, which she discovered had also been disabled. She began to feel cold, and prayed for God's assistance. Suddenly, a third phone rang in her brother's bedroom. She went to the phone and picked it up, but found no one on the line. She then called her sister for help. Ambulance attendants and police soon arrived on the scene and Ms. Moctezuma was taken to South Community Hospital. She had been stabbed forty times.

Aside from Ms. Moctezuma's identification of appellant as the man who attacked her, appellant was linked to the crime through fibers found on his tennis shoes, which were consistent with fibers on Ms. Moctezuma's clothing and in her father's house.

Appellant interposed the defense of alibi. He called as witnesses several persons who the appellant testified was cleaning out a shed on his brother's property at the time the attack on Ms. Moctezuma occurred. The witnesses also denied that the tennis shoes in question belonged to the appellant. However, a prosecution witness testifed on

rebuttal that she had dated the appellant, and that the tennis shoes belonged to him.

## I.

In his first assignment of error, the appellant raises an issue which is of much concern to this Court. Appellant asserts that evidence was admitted revealing that he had failed to pass a polygraph examination conducted by police as part of its investigation of this case.

The facts regarding this issue are as follows: At trial, defense counsel sought to collaterally impeach the testimony of Ms. Moctezuma by cross-examining a police detective with statements attributable to the victim as contained in an Arrest Warrant Application and Affidavit. Counsel also attempted to impeach the detective regarding information from others which he attested as true. The prosecutor then sought to introduce the Arrest Warrant Application and Affidavit, and the document was admitted without objection as State's Exhibit No. 57. At a hearing on appellant's post-trial motion for new trial, it was revealed that the third page of the exhibit contained information that the appellant "was being deceptive and was not telling the truth during the polygraph examination in reference to relevant questions concerning the case." All of the parties stated that during trial they did not realize the exhibit contained this information. Appellant moved for a new trial based on this disclosure. The prosecutor then called two jurors as witnesses. Both testified they were not aware of this information, and that the issue of a polygraph examination was never discussed by the jury during deliberations.

■ It is beyond dispute that admission of this information, with or without objection, constituted error. *Jones v. State*, 527 P.2d 169 (Okl.Cr.1974). This determination does not, however, end our inquiry. We have previously held, regarding this issue, that "unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required." *Birdsong v. State*, 649 P.2d

786 (Okl.Cr.1982). Our examination of this issue, therefore, centers around two considerations: *First*, was testimony by the jurors admissible to prove that the appellant was not prejudiced by this error, and, *second*, is there a reasonable possibility that the improper information contributed to the conviction?

### A.

Our consideration of this first issue is governed by 12 O.S.1981, § 2606(B) of our Evidence Code, which states:

Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify as to any matter or statement occurring during the course of the jury's deliberations or as to the effect of anything upon his or another juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes during deliberations. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. An affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying shall not be received for these purposes.

■ Section 2606(B) was enacted as a rule of incompetency prohibiting jurors from testifying to the motives, methods or mental processes by which they reached their verdict, or failed to reach it. I.L. Whinery, *Oklahoma Evidence* 197 (1985). It applies only to inquiry after the verdict has been reached and recorded. *Wacoche v. State*, 644 P.2d 568 (Okl.Cr.1982). The policy reasons for such a rule have been explained in *Keller v. State*, 651 P.2d 1339 (Okl.Cr.1982):

It is not only against public policy, but it would be opening the doors of the courts to the practice of fraud and perjury. Litigants against whom verdicts had been rendered would be continually importuning jurors, and attempting to obtain from them statements and affidavits

upon which such verdicts could be assailed. There would be no end to litigation. It would destroy the very purpose of trial by jury, and especially is this true in the trial of criminal cases.

... The jury will be subjected to influences after they have been dismissed from duty as jurors, to induce them to repent of their verdict and endeavor to revoke it. They would be liable to be tampered with. It would be difficult to place a limit to the corruption such a practice might engendre.

*Id.* at 1373, quoting *Wheller v. State,* 66 Okl.Cr. 127, 90 P.2d 49 (1939). Without the non-impeachment rule, juries would, in Learned Hand's phrase, "become Penelopes, forever engaged in unravelling the webs they wove." *Jorgensen v. York Ice Machinery Corp.,* 160 F.2d 432, 435 (2d Cir.1947). Moreover, if jurors were permitted to impeach their verdict, "it would take from the court the power to grant a new trial and give it to the jury. Manifestly this would be inconsistent with the theory of our judiciary system, revolutionary in character, and contrary to public policy." *Keith v. State,* 7 Okl.Cr. 156, 161, 123 P. 174 (1912). The non-impeachment rule lends finality to judgments, rather than leaving finality to a change of mind or second thoughts by a juror. Accordingly, we have held that section 2606(B) barred consideration of a juror's testimony that she had a reasonable doubt as to the defendant's guilt, but "I was so tired, I just gave up and voted what the—with the rest of the jurors and I knew it wasn't right." *Keller v. State, supra* at 1342–43.

■ On the other hand, the Legislature has recognized that litigants must have a method by which to inquire into the existence of events calculated to exert improper influences on the verdict. Therefore, under section 2606(B), it is not error for a judge to permit juror testimony on the question of whether improper and prejudicial information was revealed to the jury or any outside influence was improperly brought to bear upon any juror. *Smith v. State,* 656 P.2d 277 (Okl.Cr.1982). The rule codifies the United States Supreme Court's long-ago statement that

[a] juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind.

*Mattox v. United States,* 146 U.S. 140, 148–49, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1982).

■ We believe that the Legislature, through enactment of section 2606(B), has drawn a line between subjective and objective events, rendering testimony concerning the former incompetent and the later admissible. The central focus of section 2606(B) is upon insulation of the manner in which the jury reached its verdict, and this protection extends to all of the components of deliberation. Excluded from that focus are prejudicial extraneous information or influences *injected into* the deliberative process. Thus, we have indicated that a juror is competent to testify to statements made by the bailiff to the jury or information acquired prior to trial. *See Smith v. State,* 656 P.2d 277, 282 (Okl.Cr.1982). In difficult line drawing cases, the line sould be drawn in favor of juror privacy, and the testimony should be disallowed. We note also that the rule applies not only to the invalidation of the jury's verdict, but to its validation as well. *See L.* Whinery, *supra* at 198.

■ Turning to the case at bar, we believe this evidence was properly admitted. The testimony herein went not to the thought processes or the jury's method of deliberation, but rather, whether the jury had been exposed to improper polygraph evidence. Therefore, this testimony was properly heard by the trial court, and may be considered by this Court in reviewing this issue on appeal.

### B.

■ We now consider whether there existed a reasonable possibility that this information contributed to the jury's verdict. The trial judge made a finding that the error did not influence the outcome of the case, and we agree that this finding is

supported by the record. The jurors who testified herein stated that the issue of the polygraph examination was never discussed by the jury and that neither of them knew the exhibit contained such information. One of the juror's also testified that "if anyone saw any reference to polygraph ... I'm sure anyone would feel that was a key item and they would bring it to everyone's attention and no mention was made by anyone in the jury room." Moreover, although we disagree with the District Attorney's characterization of the evidence as "overwhelming," we do note that the victim herein was never inconsistent either in her statements before the jury, or on the information she gave to the police. No serious doubt has been raised to her credibility. Accordingly, this error does not require reversal, and the proposition is without merit.

## II.

In his second assignment of error, the appellant complains he has been subjected to double jeopardy, in violation of the federal and state constitutions.[1] He maintains that he was tried and convicted for two counts of Assault with a Deadly Weapon with Intent to Kill, although the evidence reveals only one criminal transaction. *Brief of Appellant* at 15. Therefore, under his rationale, the trial resulted in the imposition of double punishment for a single act, which is constitutionally improper.

■ The prohibition against double jeopardy found in both the Federal and Oklahoma Constitutions enforces two distinct policies of law: that no person should be punished more than once for the same offense, and that no person should be vexed by successive prosecutions for a single crime[2] or criminal transaction.[3] *Green v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); and *Ex Parte Lange*, 85 U.S. (18 Wall.) 163, 173, 21 L.Ed. 872 (1874). It is important to recall that "[t]he two prohibitions are based on separate policies and are designed to accomplish different objectives." *Note*, 11 Stan.L.Rev. 735, 736 (1959). We are concerned here with the prohibition against multiple punishment, which one commentator has properly defined as "forbid[ding] [the] penalizing [of] an accused more severely than the law provides, through the device of finding that he has committed several violations of substantive law where only one exists." *Comment*, 65 Yale L.J. 339, 340 (1956).

■ In resolving whether an accused has been subjected to multiple punishment for the same criminal act, we determine if the criminal episode involves separate and distinct offenses, consisting of different elements or dissimilar proof. *Starnes v. State*, 507 P.2d 920, 921–22 (Okl. Cr.1973). *Accord Johnson v. State*, 611 P.2d at 1144. Offense are distinct and separate if they "are not mere means to some other ultimate objective, nor are they offenses included in some other offense,

---

1. U.S. Const. amend V states that "[no] person shall be subject for the same offense to be twice put in jeopardy of life or limb ..." Okla. Const. art. II, § 21 commands that "[no] person, after having been once acquitted by a jury, be again put in jeopardy of life or liberty for that which he has been acquitted. Nor shall any person be twice put in jeopardy of life or liberty for the same offense."

2. A majority of this Court applies the "same evidence" test to enforce the constitutional ban against successive prosecutions. *See Stohler v. State*, 696 P.2d 1038 (Okl.Cr.1985). This test asserts that "[a] conviction or acquittal upon one indictment is no bar to subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon

one of them would have been sufficient to warrant a conviction upon the other." *Morey v. Commonwealth*, 108 Mass. 433, 434 (1871).

3. This writer has been, and remains, of the opinion that "[t]he double jeopardy clause required the prosecution, except in the most limited circumstances, to join at one trial all charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction." *Ashe v. Swenson*, 397 U.S. 436, 453–54, 90 S.Ct. 1189, 1199, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring). *See Stohler v. State*, 696 P.2d 1038, 1041 (Parks, P.J., dissenting). This standard was the test since statehood for resolving claims of successive prosecutions, and remained the standard until at least 1980. *See Johnson v. State*, 611 P.2d 1137 (Okl.Cr.1980).

nor are they merely different incidents or facets of some primary offense." *Clay v. State*, 593 P.2d 509, 510 (Okl.Cr.1979). A continuing offense, on the otherhand, is "a transaction or series of acts set on foot by a single impulse, and operated by an unintermittent force, no matter how long it may occupy." *Estep v. State*, 11 Okl.Cr. 103, 143 P. 64, 66 (1914). For example, a claim of double punishment is typically rejected when an accused person injures or victimizes several persons in one criminal transtion, and it is improper to convict him for distinct crimes against each victim. *See Clay v. State, supra. See also Jennings v. State*, 506 P.2d 931 (Okl.Cr.1973). Conversely, we have held that "where two acts of rape have occurred within a short period of time, [and involving one victim] it is part of a continuous process and constitutes only one crime" for purposes of election. *Crawford v. State*, 688 P.2d 347 (Okl.Cr. 1984). *Cf. People v. Berner*, 42 Colo.App. 520, 600 P.2d 112 (1979) (defendant was convicted of two counts of assault when he delivered "two blows ... to the same person within a short period of time as part of a continuous harangue ..." *Id.* 600 P.2d at 113. *Held:* one conviction for assault set aside); and *Ex Parte Birl*, 545 S.W.2d 169 (Tex.Crim.App.1977) (passage of a few seconds is not sufficient itself to interrupt a transaction as to allow carving of two or more offenses from an assault directed as a single victim).

██ With these principles in mind, we turn to the case at bar. Both at the close of the State's evidence and at hearing on the motion for new trial, the appellant asserted that the facts showed the victim was injured in a single, uninterrupted transaction and, therefore, only one count was proper. The trial court rejected this assertion, stating:

> Well, in my judgment—now, the evidence was that this defendant stabbing this girl forty times. In my opinion, each time he stuck that knife into the girl, he committed a separate assault. Now he was charged with only two of those ...

We first note our disagreement with the analysis offered by the trial court, who indicates it was proper to charge and convict the appellant for two counts since technically he could have been charged with up to forty separate crimes. This rationale is contrary to that noted above. We agree with our brethren in Illinois, who reached this same issue in *People v. Wilson*, 93 Ill.App.3d 395, 48 Ill.Dec. 744, 745, 417 N.E.2d 146, 147 (Ill.App.1981), and noted:

> The prosecution asserts, however, that each of the blows delivered by the defendant may serve as the basis for a separate offense of aggravated battery or attempt (murder). According to the argument, the defendant could have been convicted of and concurrently sentenced for numerous counts of aggravated battery and attempt (murder) judging from Glenda's injuries. Such suggestion is inane. Only a single defendant and single victim were involved. The offenses at issue, aggravated battery and attempt (murder) arose from a series of blows to the victim which were not separated by an significant amount of time.
>
> We find that the muliple blows delivered by the defendant to Glenda constitue a single offense. Accordingly, we affirm his conviction for attempt (murder) and vacate his conviction for aggravated battery.

██ Although we disagree with the rationale employed by the trial judge, we agree with his conclusion that appellant was not subjected to double punishment forbidden by the state and federal constitutions. Under these facts, it is clear that each of the two convictions were based on distinct and separate acts. Although the elements of the two offenses are identical, dissimilar proof was required to prove each. In the first incident, Ms. Moctezuma was attacked from behind as she stood near a desk, and was then stabbed in the shoulder, chest and abdomen. The appellant stopped stabbing her, and she fainted. The second act occurred when the victim regained consciousness and went to the telephone to call for help. She was again attacked, but was stabbed in the legs, hand

and sides. In this case, it is clear that the appellant himself broke off the first attack. He returned to attack her when she attempted to use the telephone. A significant gap exists between the first and second attack so that the criminal transaction may not be called uninterrupted or unintermittent. Moreover, the fact that the crimes were committed in rapid succession does not negate the fact that separate crimes were committed, so long as a separation does exist. *See Nevaquaya v. State,* 614 P.2d 82 (Okl.Cr.1980). This assignment of error is without merit.

### III.

Next, appellant alleges that the trial court improperly rejected his only requested instruction, which he maintains contained a theory of defense. The requested instruction stated:

> If you find from the evidence that Count I and Count II of the information are a part of the same act or transaction, then you should acquit the defendant of Count II of the information; however, if you find that there was a break in the attack or transaction, such as to constitute a withdrawal and formation of a new intent, then you should find the defendant guilty of both Count I and Count II of the information.

■ Under our mode of procedure in the trial of criminal cases, questions of law are the exclusive province of the trial judge, while the jury is limited in its consideration to questions of fact. *See* 22 O.S. 1981, §§ 832, 834. Appellant's requested instruction dealt with the issue of double jeopardy, which we believe was a question of law to be decided by the trial judge, not the jury. This assignment of error is without merit.

### IV.

Appellant next contends that comments made by the prosecutors during cross-examination and closing arguments constituted prosecutorial misconduct, and require a reversal or modification. We disagree.

■ In this case, we note that none of the allegations of prosecutorial misconduct which occurred in closing argument were objected to. We have previously held that a defendant must object to all alleged prosecutorial misconduct, or the same will be waived unless it constitutes fundamental error. *Glass v. State,* 701 P.2d 765 (Okl. Cr.1985). We have examined the allegations contained in appellant's brief and find that none constitute fundamental error. We therefore decline to reverse the convictions or modify the sentences based on the allegations of prosecutorial misconduct which occurred in closing argument. Likewise, only two of the allegations of impropriety in cross-examination were met with an objection, and neither of these two allegations require reversal or modification. This assignment of error is rejected.

### V.

Appellant's fifth assignment of error maintains the identification testimony of Ms. Moctezuma should have been excluded because it was influenced by police misconduct and therefore was unreliable. We disagree.

■ We first note that an in-court identification is susceptable to suppression only if it is tainted by a suggestive pre-trial identification procedure. *Bryson v. State,* 711 P.2d 932, 934 (Okl.Cr.1985). However, even a suggestive pre-trial identification process will not invalidate a courtroom identification that can be established as idependently reliable. *Id.*

■ In this case, the record reflects no pre-trial impropriety by the police. On January 17, 1984, while she was still hospitalized, Ms. Moctezuma assisted police in making a composite drawing of the accused. Thereafter, she viewed two photographic line-ups, one of which contained a photograph of the appellant. Both line-ups contained numerous photographs, and Ms. Moctezuma was unable to give a positive identification. Some days later Ms. Moctezuma selected the appellant from an in-person line-up conducted at the Oklahoma County Jail. We have carefully considered

the record in this case and find that none of the pre-trial identification procedures were so suggestive as to taint Ms. Moctezuma's identification at trial.

## VI.

In a related issue, the appellant contends the trial court erred in failing to issue an instruction to the jury warning them about the problems surrounding eye-witness identification. However, no requested instruction was submitted by the defendant to the trial court, and, therefore, the trial court was not obligated to give the instruction. *Frazier v. State*, 706 P.2d 165 (Okl.Cr.1985).

## VII.

Appellant next asserts he was the victim of ineffective assistance of counsel through the alleged incompetencey of the two lawyers he hired to represent him. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court determined that an appellant must make two showings before a conviction will be reversed for failure to provide effective assistance of counsel: First, "the defendant must show that counsel's performance was deficient," and, "[s]econd, the defendant must show that the deficient performance prejudiced the defense." Id. at 687, 104 S.Ct. at 2064. Counsel's performance is deficient if it falls below that expected of a reasonably competent and skilled defense attorney. *Johnson v. State*, 620 P.2d 1311 (Okl.Cr. 1980).

Appellant's allegation is premised on three grounds. He claims that ineffectiveness is shown by counsel's failure to submit a requested instruction on eyewitness identification. However, under the facts of this case, such an instruction would not have been required even if counsel had requested it. Appellant asserts that Ms. Moctezuma's failure to identify appellant's picture in a photographic line-up warranted the instruction. We rejected this precise argument in *Frazier v. State*, 706 P.2d 165, 167 (Okl.Cr.1985). Next, he

claims that counsel's failure to object to alleged prosecutorial misconduct reveals ineffective assistance of counsel. We first note that not all of the allegations cited by the appellant constitute prosecutorial misconduct. And, even if appellant had objected to those improper comments made by the District Attorney, we would not reverse or modify these convictions, under the facts of this case. Finally, he claims ineffective assistance of counsel resulted when the defense permitted State's Exhibit No 57, the Arrest Warrant Application and Affidavit, to be admitted into evidence. We agree that defense counsel should have been more careful in examining this exhibit prior to its admission, and that he was negligent in this regard. However, we already have determined that the jury was not prejudiced by the polygraph information contained therein so as to deprive the appellant of a fair trial.

We have carefully considered the entire record in this case and find that the two attorneys representing the appellant did, for the most part, represent the accused in an ethical and highly competent manner. This assignment of error is without merit.

## VIII.

Finally, the appellant asserts the "cumulative effect of the errors occurring at trial mandate that this case be remanded for a new trial." *Brief of Appellant* at 38. We have held that an "accumulation of error" argument will be rejected were all of the alleged errors are meritless. *McDonald v. State*, 674 P.2d 51 (Okl.Cr.1984). None of the assignments of error herein have merit and this assignment is rejected.

Accordingly, for the foregoing reasons, the judgment and sentence of the trial court is AFFIRMED.

BRETT, P.J., and BUSSEY, J., concur.