2007 OK CR 38

**Byron Cornelius THOMPSON, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2006–577.**

Court of Criminal Appeals of Oklahoma.

Oct. 11, 2007.

Richard Couch, Assistant Public Defender, Tulsa, OK, attorney for defendant at trial.

James M. Hawkins, Scott Gengras, Assistant District Attorneys, Tulsa, OK, attorney for state at trial.

Stuart Southerland, Assistant Public Defender, Tulsa, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Donald D. Self, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, Judge.

¶1 Byron Cornelius Thompson was charged in Tulsa County, Case No. CF–2005–812, with Murder in the First Degree, under 21 O.S.Supp.2004, § 701.7 (Count I), and two counts of Feloniously Pointing a Weapon, under 21 O.S.2001, § 1289.16, After Former Conviction of a Felony (Counts II and III).[1] Thompson was tried by jury and convicted on all three counts. In accordance with the jury's recommendation, the Honorable P. Thomas Thornbrugh sentenced Thompson to Life Imprisonment Without Parole on Count I and to imprisonment for Fifty (50) years and a fine of $10,000 on both Counts II and III, with all the sentences to be served consecutively. Thompson's direct appeal of his convictions and sentences is properly before this Court.

¶2 In the early evening of February 13, 2005, Rico Britt, Trae Norman, Anthony Ross, and William Anthony were at the River's Edge apartment complex at 61st and Peoria Street in Tulsa. All four were members of the street gang known as the "Bloods." They encountered the defendant, Byron Cornelius Thompson, whom they recognized as a member of a rival gang, the "Hoover Crips." Thompson recognized the four as being Bloods and retrieved his .308 caliber semi-automatic assault rifle.

¶3 Thompson pointed the assault rifle at Britt and Norman, who were standing to-

---

1. Count II was for pointing a weapon at Trae Norman; Count III was for pointing at Rico Britt.

gether at the front of the group in an apartment breezeway area. Thompson then pulled the trigger, and the gun clicked but did not fire. Britt, Norman, Ross, and Anthony took off running, scattering in different directions, as Thompson attempted to clear the jam in the gun.

¶ 4 Timothy Silkey, a cab driver, had come to the area to pick up a customer. Silkey testified that he saw three black males, whom he believed to be in their late teens, come running out of the River's Edge apartment complex. Two of the men cut across in front of him, and the other, William Anthony, ran alongside his cab. Silkey then saw another black male, who came out of one of the apartment breezeways, chasing after the group. Silkey testified that this individual was carrying an assault rifle and that it appeared the gun had jammed, because the man was hitting the side of it and saying, "hell, no." Silkey testified that the man appeared to be "trying to load one up into the chamber" as he ran.[2]

¶ 5 Silkey testified that when the others realized the gun had jammed, they turned around and started back toward the man with the gun.[3] They didn't get far, however, before the man started firing, and the others turned again and continued to run. The gunman remained inside the River's Edge complex's fenced parking lot as he shot at the group while they ran, firing approximately twelve times.[4] William Anthony, who was only fifteen years old at the time, was shot in the back as he reached the parking lot of a local Kwick–Stop convenience store.[5]

¶ 6 Fifteen-year-old Brittany Cherry lived in the neighborhood and was walking her dog that night. She saw Thompson shoot Anthony and described Anthony falling and then getting up briefly, saying, "I can make it,"

before falling immediately back down and not moving again. The medical examiner testified that a single bullet entered Anthony's back, went through his left lung, passed through the heart, "producing a massive destruction of the heart," and exited his chest in fragments.[6] He died at the scene from massive blood loss.

¶ 7 William Douglas lived in the neighborhood and was in his driveway preparing to go to work as a security guard when he heard shots fired. Shortly thereafter Douglas heard the sound of someone kicking the fence at the house across the street and looked up and saw a black male coming "through the fence" from the River's Edge complex, which was behind the house. The man, whom Douglas identified at trial as Thompson, pulled a military-style rifle out from under his jacket and attempted to put it in a storm drain. Douglas yelled to his roommate, who was bringing out his four children to take them to church, "he's got a gun," and pushed one of his roommate's daughters into a car to protect her. Thompson then turned toward Douglas and pointed the gun directly at him. Douglas heard a "click," which sounded like the pulling of a trigger, but the gun did not fire. Thompson then hid the rifle under some boards that were along the fence and ran back toward the River's Edge complex. Douglas notified the police of what he had seen when he arrived at work that night. Police retrieved the gun from along the fence three days later.[7]

¶ 8 In an interview on March 1, 2005, Thompson admitted that he was the shooter and that he killed Anthony.[8] Thompson knew William Anthony, Rico Britt, and Trae Norman by name and stated that they were all "Bloods" from "the neighborhood."

2. Silkey was unable to positively identify Thompson at trial as the man he saw with the gun.

3. Silkey heard someone say "get him," as the group turned and charged the man with the gun.

4. Silkey testified that he heard at least ten shots fired in very rapid succession. Twelve cartridge cases were found in the River's Edge parking lot.

5. Thompson was firing approximately 250 feet away from where Anthony fell and died.

6. The medical examiner testified that it would have been about 15 seconds from the time Anthony was shot until he died.

7. The twelve casings found at the scene were all positively matched to the gun recovered.

8. A videotape of this interview was admitted into evidence and played for the jury at trial.

Thompson claimed that these three had been threatening him, by words and gestures, earlier that day and on other occasions. Thompson alleged that Anthony had a chrome revolver with him that day and that he took two shots at Thompson while they were in a breezeway at the River's Edge apartments, before Thompson got his rifle and started shooting.[9] Thompson described standing in the parking lot and shooting at the group, which included about six or seven Bloods, as they ran away. Thompson stated that he was not shooting at anyone in particular; he was "just shooting," "trying to defend myself." [10]

■ ¶ 9 In Proposition I, Thompson asserts that it was improper to convict him of two separate counts of feloniously pointing a weapon, because the evidence was insufficient to support two counts and because it violates double jeopardy under the facts of this case. The State maintains that Thompson was appropriately convicted of two counts because two victims were involved.

¶ 10 We begin by examining the language of the statute at issue, 21 O.S.2001, § 1289.16.

It shall be unlawful for any person to willfully or without lawful cause point a shotgun, rifle or pistol, or any deadly weapon, whether loaded or not, at any person or persons for the purpose of threatening or with the intention of discharging the firearm or with any malice or for any purpose of injuring, either through

physical injury or mental or emotional intimidation. . . .

The language of § 1289.16 makes clear that this crime is about the act of *pointing a firearm* at another person or persons with some kind of improper purpose. Because the statute defines the crime as pointing a gun "at any person or persons," the State need not prove that the defendant pointed a gun at a particular person, in order to establish a violation of § 1289.16. An individual who points a firearm at a group of people, with one of the purposes/intents outlined in the statute, violates § 1289.16.

¶ 11 On the other hand, the language of § 1289.16 likewise makes clear that when a defendant points a firearm at a group of people and attempts to fire at the group, or seeks to intimidate the people in the group with the weapon, only a single violation of the statute has been committed. That is what happened in the current case. Both the victims and the defendant describe the encounter in the River's Edge apartment breezeway as Thompson pointing his assault rifle at a group of four or more members of the Bloods gang, who were standing together.[11] Norman and Britt were standing at the front of this group, closest to Thompson, which may be why they were listed as the victims in Counts II and III—although others were also put at risk when Thompson pointed the gun at the group and attempted to fire.[12] There is no evidence that Thompson pointed his weapon at Norman and separately pointed his weapon at Britt.[13]

9. Thompson's claim that William Anthony had a gun and shot at him first was not supported by any independent evidence. All of the witnesses described Thompson as the only one with a gun, and there was no evidence of other shots fired.

10. Thompson stated that he bought the rifle used in the shooting a few weeks earlier "on the street," from a guy named "Michael," who purchased it at "Dong's." Matthew Lehman testified at trial that he purchased the gun, a knock-off of an H & K model 91, from Dong's Sporting Goods in Tulsa. Lehman testified that a friend of his, Michael Stripley, found a buyer for it and that they sold the gun to Thompson at the River's Edge apartments.

11. Both Norman and Britt testified at preliminary hearing. When they later refused to testify at Thompson's trial, their preliminary hearing testimony was read to the jury. (This issue is

addressed in Proposition II.) Britt stated in his testimony that he was with Norman, Ross, and Anthony at the River's Edge complex when Thompson "pointed a gun at us, Byron pointed a gun at us." Norman likewise testified that the four of them were together in the apartment breezeway when Thompson "came out of the corner and pulled a gun on all of us." When asked to describe what he meant, Norman responded, "Like he really pointed it at us."

12. When the prosecutor pressed Norman on the issue of whether Thompson pointed the gun at *him*, in particular, he responded, "[b]oth me and Rico because we were in front."

13. There was evidence that Thompson later pointed and attempted to fire his assault rifle at the neighbor, William Douglas. Yet Thompson was not charged with a crime in connection with

¶ 12 In *Wimberly v. State*,[14] the defendant was convicted of three counts of Feloniously Pointing a Weapon, under 21 O.S.1981, § 1289.16. Like Thompson, he argued that because the language of the statute refers to "any person or persons," he could only be guilty of one count, not three.[15] This Court responded by focusing upon the specific facts of that case. "The evidence at trial indicates that appellant pointed the pistol at S.D.'s grandfather, her brother and her cousin at three distinct times. While it may be true he may have also pointed at the group of people, there is adequate evidence of separate occasions as well." [16] Hence *Wimberly* is factually distinguishable from the current case; yet the analysis of *Wimberly*, which focused upon separate acts of pointing, supports the analysis herein.

¶ 13 The *Wimberly* Court acknowledged the general proposition emphasized by the State, namely, that "offenses committed against different victims are not the same for double jeopardy purposes though they arise from the same episode." [17] Nevertheless, in *Wimberly* and other cases, this Court has recognized that double jeopardy analysis must begin with the statute(s) defining the crime(s) at issue.[18] Although a single criminal "episode" could involve multiple violations of § 1289.16—where a defendant separately points a firearm at different individuals or different groups of people—a single act of pointing a firearm at a group of people constitutes only a single violation of § 1289.16. Thus Count III in the current case must be reversed and dismissed.

¶ 14 In Proposition II, Thompson challenges the trial court's decision to allow the State to introduce as evidence the preliminary hearing testimony of Rico Britt and Trae Norman, after finding that these witnesses were "unavailable" at trial. Thompson challenges the court's finding of "unavailability" and alleges a violation of his constitutional right to confront the witnesses against him.

¶ 15 When Norman was called to testify, he answered a few questions about his age and prior convictions but then stated, "I am going to plead the Fifth. I don't want to do this." At a sidebar conference that followed, the prosecutor stated that he didn't believe Norman had a valid Fifth Amendment privilege to invoke regarding his testimony. The trial court excused the jury to further investigate. Norman was then questioned by the court, the prosecutor, and defense counsel. The purpose and limits of the Fifth Amendment privilege were explained to Norman, as was the power of the court to hold him in contempt and punish him for inappropriately refusing to testify. During this questioning Norman made clear that he would refuse to answer any questions and that his refusal was not based upon a concern that he would incriminate himself (*i.e.*, Fifth Amendment privilege), but rather because he feared violent reprisal against either himself or his family if he testified.[19] The trial court announced that it would find Norman "unavailable" and allow the State to introduce his preliminary hearing testimony. The prosecutor stated that he would like to question

this entirely separate incident. Counts II and III were charged as involving Norman and Britt, respectively, and the jury was instructed, and convicted Thompson, on this basis.

14. 1985 OK CR 37, 698 P.2d 27.

15. *Id.* at ¶ 8, 698 P.2d at 30. The *Wimberly* case is not cited by either party.

16. *Id.* at ¶ 9, 698 P.2d at 30–31.

17. *Id.* at ¶ 10, 698 P.2d at 31 (citing *Clay v. State*, 1979 OK CR 26, 593 P.2d 509).

18. For example, in *Weatherly v. State*, 1987 OK CR 28, ¶ 17, 733 P.2d 1331, 1336, we noted that the double jeopardy prohibition in both the Fed-

eral and Oklahoma Constitutions protects individuals against successive prosecutions for a single crime and multiple punishments for the same offense. We noted that the prohibition against double punishment is about " 'forbid[ding] [the] penalizing [of] an accused more severely than the law provides, through the device of finding that he has committed several violations of substantive law where only one exists.' " *Id.* at ¶ 17, 733 P.2d at 1336 (quoting Comment, 65 Yale L.J. 339, 340 (1956)).

19. Norman stated, "I mean, I have got two kids I got to think about," and noted that "everybody else that did this [testified] on some other cases, they ain't here right now." Norman acknowledged that he had repeatedly told the prosecutors, prior to trial, that he would testify.

Norman about his refusal to testify in front of the jury; and the trial court agreed, without objection from defense counsel.

¶ 16 The prosecutor then questioned Norman, in front of the jury, about the fact that he had repeatedly told the prosecutor he would testify, but was now refusing to do so. The prosecutor asked why Norman was refusing to testify, and he responded, "I believe my life is in danger." [20] When asked if he had been threatened, Norman responded, "A couple of times, sir." After establishing that Norman testified at the preliminary hearing, the prosecutor moved that he be declared "unavailable" and that the State be allowed to rely upon the transcript of his preliminary hearing testimony.[21] The trial court explained to the jury that Norman was refusing to testify, that the court was declaring him "unavailable," and that portions of his earlier sworn testimony would be presented to the jury later in the trial.[22]

¶ 17 The State then called Rico Britt as its next witness. When the prosecutor asked Britt to acknowledge that he was the same Rico Britt who had testified at the preliminary hearing, Britt stated, "Yeah, I plead the Fifth." Upon further questioning Britt maintained that he would not testify about anything, but acknowledged that his refusal was not based upon fear of incriminating himself. When pushed about why he was refusing to testify, Britt testified that he was "a little bit" afraid and that he had been threatened "a little bit." [23] The trial court granted the State's motion to declare Britt "unavailable" and to admit his preliminary hearing testimony, and again explained its

ruling to the jury.[24] The preliminary hearing testimony of Britt and Norman was read before the jury the next day, with a substitute person reading the transcribed statements of the two witnesses, the trial court reading the part of the magistrate judge, and the prosecutor and defense counsel reading their own remarks and questions from the transcript.

¶ 18 Thompson initially challenges the trial court's finding that Norman and Britt were "unavailable," under 12 O.S.Supp.2002, § 2804.[25] "Unavailability" in this context "includes the situation in which the declarant ... [p]ersists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." [26] Although unavailability also includes the situation where a witness has a valid Fifth Amendment privilege not to testify,[27] this was not the basis for the court's unavailability findings in this case (despite the references by the witnesses).

¶ 19 Thompson correctly notes that the trial court never specifically ordered Britt and Norman to testify. Yet the record makes clear that the trial court applied reasonable pressure on the witnesses to testify, but recognized the futility of the effort given the circumstances of the case. Norman was quite clear that he feared for his life and for the safety of his children if he testified. Britt downplayed his fearfulness and was unclear about whether he had been threatened. Nevertheless, this Court will not ignore the actual circumstances of this gang case. This murder appears to have been motivated solely by gang rivalry, and evi-

20. Defense counsel objected to this question/answer, but then withdrew his objection before the trial court was able to rule upon it.

21. When asked if there was an objection to this ruling, defense counsel simply stated, "I continue to object," without explaining the specific basis for his objection.

22. The trial court noted, "He is unavailable because he chooses to be unavailable."

23. Moments later Britt denied that he had been threatened by anyone and stated that he didn't know why he was afraid. Nevertheless, he continued to refuse to testify.

24. Defense counsel announced Thompson's "[s]ame continuing objection" to this ruling.

25. Section 2804 allows the admission at trial of hearsay evidence under certain circumstances, including when it consists of testimony given at another hearing in the case, if the opposing party had an opportunity (and motive) to examine the witness at the prior hearing, and if the declarant whose testimony is offered has become "unavailable as a witness." 12 O.S.Supp.2002, § 2804(B).

26. 12 O.S.Supp.2002, § 2804(A)(2).

27. See 12 O.S.Supp.2002, § 2804(A)(1).

dence was introduced at trial (and is commonly known) about the potential for and resulting fear of reprisal against witnesses that often accompanies such cases. We credit the ability of the district court to evaluate these factors, and we will give broad deference to the district court's appraisal of the realities of a particular case in this context.[28] We conclude that the district court did not abuse its discretion in finding that both Norman and Britt were "unavailable" as trial witnesses in this case.[29]

¶ 20 Thompson's larger claim is that even if Norman and Britt were unavailable, allowing their preliminary hearing testimony to be introduced at his trial violated his constitutional right to confront the witness against him.[30] Thompson properly invokes the Supreme Court's recent decision in *Crawford v. Washington*,[31] which recognized a defendant's right to cross examine the witnesses against him as the centerpiece of the Sixth Amendment's confrontation right.[32] The use of preliminary hearing testimony in a criminal trial is the kind of "testimonial hearsay" that *Crawford* recognized as being

subject to two fundamental Sixth Amendment requirements: (1) the witness must be unavailable, and (2) the defendant must have had a prior opportunity to cross examine the witness.[33]

¶ 21 We have already affirmed the trial court's finding that Norman and Britt were "unavailable." We turn now to the issue of cross examination. While Thompson cannot deny that his counsel was allowed to cross examine Norman and Britt at the preliminary hearing, he argues that limitations placed upon this cross examination—by both the preliminary hearing judge and changes to Oklahoma law—rendered it inadequate to satisfy his right to fully confront these key State witnesses. We take up these arguments in turn.[34]

¶ 22 Defense counsel's cross examination of Britt and Norman at Thompson's preliminary hearing was full and substantial.[35] Defense counsel was allowed to question both men extensively on the details of what happened during the encounter with Thompson at the River's Edge, the shooting that followed, the gang membership of all the people

**28.** Cf. *Jennings v. Maynard*, 946 F.2d 1502, 1505 (10th Cir.1991) (affirming finding of witness unavailability, despite lack of court order to testify, and noting that where witness testified, in camera, that he was refusing to testify due to threats to his life and that of members of his family, it would have been "inappropriate" for court to order witness to testify).

**29.** Cf. *Williamson v. State*, 1991 OK CR 63, ¶¶ 75–81, 812 P.2d 384, 402–03 (upholding trial court's unavailability finding without requiring actual order to testify), *grant of habeas corpus relief on other grounds aff'd*, 110 F.3d 1508 (10th Cir.1997). *Williamson* recognized that an unavailability finding does not require a specific determination of the witness's reason for refusing to testify, nor does it require the State to establish that it has provided "sufficient protection," so that a witness could testify without fear. *Id.* at ¶¶ 79–81, 812 P.2d at 403.

**30.** *See* U.S. Const. amend. VI; Okla. Const. art. 2, § 20.

**31.** 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**32.** The *Crawford* Court wrote:

To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive

guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination....

Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is so obviously guilty. This is not what the Sixth Amendment proscribes.

*Id.* at 61–62, 124 S.Ct. at 1370–71.

**33.** *Id.* at 68, 124 S.Ct. at 1374 ("Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."); *see also Mitchell v. State*, 2005 OK CR 15, ¶ 16, 120 P.3d 1196, 1202–03 (summarizing *Crawford*); *Miller v. State*, 2004 OK CR 29, ¶¶ 25–26, 98 P.3d 738, 743 (same). Although the *Crawford* Court declined to adopt a precise definition for the term "testimonial" in this context, it specifically found that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing...." 541 U.S. at 68, 124 S.Ct. at 1374.

**34.** The State's brief fails to respond to either of Thompson's arguments in this regard.

**35.** The cross examination of Norman covers ten transcript pages, and the cross examination of Britt covers over seven transcript pages.

involved, how long each had known the defendant and the others, *etc.* The court limited defense questioning on only a few specific issues, relating mostly to details the men had initially told police.[36] Although these issues were arguably relevant to Britt and Norman's credibility, the particular issues on which questioning was limited were not significant within the overall context of the case. Defense counsel had ample opportunity to develop and challenge Britt and Norman's testimony about the central facts of what happened, as well as their credibility and potential bias in this regard.

¶ 23 Furthermore, the scope of the defense cross examination of Britt and Norman was not prejudicially impacted by changes to Oklahoma law regarding preliminary hearings. Thompson acknowledges that in *Howell v. State*,[37] this Court approved the use of preliminary hearing testimony in a criminal trial when a witness is unavailable at trial and the defendant had an opportunity to cross examine the witness at preliminary hearing.[38] *Howell* recognized that preliminary hearing testimony is not equivalent to trial testimony.[39] Yet we concluded that the witness's preliminary hearing testimony in that case "was given in circumstances closely approximating those of a typical trial," noting three parallels: (1) the testimony "was made under oath in a truth-inducing courtroom

atmosphere"; (2) the defendant was represented by counsel; and (3) defense counsel had "ample opportunity to cross examine" the witness.[40]

¶ 24 Thompson argues, however, that changes in Oklahoma preliminary hearing law, which took effect in 1994, have limited the scope of such hearings, such that they are no longer adequate substitutes for the defendant's trial right to cross examine the witnesses against him when a witness becomes unavailable by the time of trial.[41] Yet Thompson fails to show how these changes prejudicially impacted the scope of defense counsel's cross examination of Britt and Norman, such that it infringed upon his constitutional right to confront these witnesses. The three "trial-like" features noted in *Howell* were equally present at the preliminary hearing in Thompson's case.

¶ 25 This Court acknowledges Thompson's broader point that it is possible, in a particular case, that restrictively limiting defense counsel's cross examination of a witness at preliminary hearing could make admission of that witness's transcribed testimony at trial—upon a finding of unavailability—a violation of the defendant's constitutional right to confront the witnesses against him. And limiting cross examination on key aspects of the crime(s) at issue and the defendant's involvement in such crime(s) is, of

36. The court limited defense counsel's questioning of Britt on two issues: whether he had provided an inaccurate home address to the police and whether he had told police that both he and Norman "ran west." The hearing judge was more impatient during defense cross examination of Norman, once commenting, "Mr. Couch, we really need to speed this up. It takes you about a minute and a half to ask a question." Nevertheless, the court only limited counsel's cross examination of Norman on a few issues: whether Norman had described for police what Thomson and one of the guys with him was wearing on the day of the shooting (after Norman claimed he couldn't remember what either was wearing) and Norman's recollection regarding the height of one of the other Blood members at the scene.

37. 1994 OK CR 62, 882 P.2d 1086.

38. *Id.* at ¶¶ 11–20, 882 P.2d at 1090–91.

39. *Id.* at ¶ 18, 882 P.2d at 1091 ("We recognize that a preliminary hearing serves a more limited

function than does a trial and that the right of confrontation is basically a trial right.").

40. *Id.* at ¶ 18, 882 P.2d at 1091. Although *Howell* cites to authorities, such as *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that have been supplanted by the Supreme Court's decision in *Crawford*, the analysis in *Howell* is fully consistent with *Crawford*.

41. *Compare* 21 O.S.1991, § 258 *with* 21 O.S.Supp.1994, § 258 (effective September 1, 1994). Thompson focuses on the sixth and seventh paragraphs of the amended § 258, which provide that a preliminary hearing can be limited to evidence that is relevant to (1) whether a crime has been committed, and (2) whether there is probable cause to believe the defendant committed the crime, since making these two determinations is "[t]he purpose of the preliminary hearing." *See* 21 O.S.Supp.1994, § 258. Later amendments to this section have not affected the substance of these provisions. *See* 22 O.S.Supp. 2006, § 258.

course, particularly risky in this context. The Supreme Court's recognition in *Crawford* that the defendant's right to cross examine the witnesses against him is at the core of the Sixth Amendment's confrontation right certainly implies that an unfair or distorting constriction of defense counsel's cross examination of key State witnesses could result in a violation of the Sixth Amendment, whether that unjustified constriction occurs during a trial or during preliminary hearing testimony that is later introduced into evidence at trial.

¶ 26 That, however, is not what happened in the current case. Defense counsel's cross examination of Britt and Norman at the preliminary hearing was more than adequate to satisfy Thompson's right to confront these witnesses. Hence the trial court did not abuse its discretion or violate Thompson's constitutional rights by allowing the State to introduce this preliminary hearing testimony at trial.[42] Proposition II is rejected accordingly.

■ ¶ 27 In Proposition III, Thompson asserts that Norman should not have been allowed to testify at trial that he was refusing to testify because he believed his life was in danger. The prosecutor announced his intention to elicit this testimony before it was presented, and defense counsel did not object; hence we review only for plain error.[43] Thompson argues that this testimony and the prosecutor's closing argument references to it suggested that Thompson himself had threatened Norman. This assertion is totally unsupported by the record.[44] Rather, the testimony of Detective Jeff Gatwood about gang culture and attitudes suggested that there is a tremendous general pressure not to testify or get involved in prosecutions of gang cases, regardless of who has been hurt by whom and who is being prosecuted.[45] There was no suggestion that Thompson himself threatened Norman or anyone else, and there was no plain error in admitting Norman's testimony about why he was refusing to testify.

■ ¶ 28 In Proposition IV, Thompson claims that testimony by Homicide Detective Michael Zenoni constituted improper expert opinion testimony. During his testimony Zenoni was asked, in a number of different ways, whether his investigation revealed any evidence that supported Thompson's claim of self-defense, *i.e.,* his claim that someone shot at him before he shot at anyone else. Zenoni repeatedly testified that he did not find any evidence to support this claim. When defense counsel objected to this inquiry, his objection was overruled.[46] Thompson claims that Zenoni's testimony constituted improper expert opinion testimony, but the authorities cited do not support his claim.[47] We conclude that Zenoni's testimony was proper.[48] Proposition IV is rejected.

¶ 29 In Proposition V, Thompson asserts that his trial counsel was constitutionally ineffective for three reasons: (1) his counsel failed to object to the for-cause dismissal of

42. Moreover, the preliminary hearing testimony of these witnesses on the basic facts of what occurred on the evening of February 13, 2005, was consistent with Thompson's own description of what occurred that night—with the exception of the part about Anthony having a gun and firing at Thompson first . . . a claim that no other evidence supported.

43. *See* note 20 and accompanying test *supra.*

44. Hence Thompson's cases about "other crimes or bad acts" evidence are inapposite. The State's Fifth Amendment privilege cases are also inapposite, since Norman clarified during the bench conference that his refusal to testify was not based upon a claim of privilege.

45. The prosecutor summarized this attitude in his closing argument as follows: "What goes on in the street stays on the street."

46. After overruling the objection, the trial court reminded the jury that "[t]he ultimate decision on whether or not the defense of self-defense is available will be determined by you."

47. *See, e.g., Romano v. State,* 1995 OK CR 74, ¶¶ 20–25, 909 P.2d 92, 109–10 (finding that expert blood spatter testimony that blood on certain clothing was consistent with wearer of clothing being person who stabbed victim was proper expert testimony, while subsequent testimony that, based upon expert witness's expertise, person who wore bloody clothing was *not* "a passive observer of [the] stabbing" had gone too far and was inappropriate).

48. We likewise reject Thompson's assertion that Zenoni's testimony somehow shifted the burden of proof on his affirmative defense of self defense.

various prospective jurors; (2) his counsel presented inconsistent defenses; and (3) his counsel failed to object to inappropriate trial testimony. To establish ineffective assistance Thompson must demonstrate that the performance of his counsel was deficient and unreasonable and that he was prejudiced thereby.[49] Thompson can show "prejudice" only if he can establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." [50]

■ ¶ 30 Thompson challenges the for-cause dismissal of seven different jurors, some of whom were excused on the court's own motion, noting that defense counsel did not object to any of the dismissals. Thompson fails to establish that these dismissals were erroneous and cites no relevant authority in support of his claim. Thompson does not allege that any juror who served on his jury was unfair or biased against him; and he totally fails to establish any prejudice.[51]

■ ¶ 31 Thompson also challenges defense counsel's closing argument, claiming that it was confusing and unreasonable because Thompson admitted he was the shooter during a police interview. In his closing argument defense counsel strenuously argued that there was "reasonable doubt" in the case, noting that Thompson could not be matched to the gun with either DNA or fingerprint evidence, emphasizing the gang culture at issue and the rivalry between Thompson and the State's key witnesses, and arguing the possibility that Thompson was covering for someone else when he admitted being the shooter. Thompson now maintains that this approach was confusing and unreasonable because his main defense was that he was acting in self defense. Counsel's closing argument was a reasonable strategic decision, since neither the facts nor Oklahoma law supported Thompson's self-defense claim.[52] Thompson also cannot establish prejudice, as the evidence against him was too overwhelming.

■ ¶ 32 Within Thompson's third claim of ineffective assistance, he re-raises issues addressed within other Propositions, this time asserting that the challenged action/inaction constituted ineffective assistance.[53] Thompson makes the additional claim herein that his counsel was ineffective for failing to introduce evidence of Norman's four felony convictions, which occurred after he testified at Thompson's preliminary hearing, as a means of impeaching Norman's transcribed preliminary hearing testimony. The State does not contest Thompson's allegation of inadequate performance in this regard, and this Court cannot conceive of a reasonable strategic basis for declining to impeach a key state witness in this manner. Nevertheless, Thompson fails to establish prejudice. The jury was well aware that Norman was a gang member and a rival of Thompson. The fact that Norman was subsequently convicted of four felony offenses would not have had any impact on the results in this case.[54] Hence this claim is rejected as well.

■ ¶ 33 In Proposition VI, Thompson notes that Rule 6 of the Rules for District

---

49. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511–12, 146 L.Ed.2d 389 (2000).

50. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

51. Thompson briefly claims that defense counsel's inaction effectively allowed the State to have extra peremptory challenges, but Thompson fails to properly preserve or develop such a claim.

52. There was no independent evidence supporting Thompson's claim that Anthony had a gun and shot at him first. And Thompson admitted to shooting at the Bloods as they ran away.

Anthony was approximately 250 feet away from Thompson when he was shot and killed.

53. In particular, he notes that defense counsel withdrew his objection to Norman's testimony that he was refusing to testify because he feared for his life and that counsel failed to object to the prosecutor's use of hypotheticals during voir dire. In Proposition III this Court notes that there was no suggestion at trial that Thompson threatened Norman or anyone else; hence defense counsel was not ineffective for failing to object to Norman's fearfulness testimony. We address the prosecutor's use of hypotheticals in Proposition VI.

54. Thompson barely develops this claim and fails to point to evidence in the record of the four

Courts of Oklahoma states that attorneys should not ask hypothetical questions during voir dire and argues that the prosecutor's use of such questions violated Thompson's right to a fair trial.[55] Thompson argues, correctly, that this rule "is designed to prevent trial counsel from attempting to get a juror to commit to a verdict of guilty or not guilty based upon a proposed set of hypothetical facts *which parallel those expected to be presented at trial*" (emphasis in Thompson's brief). The voir dire questions challenged on appeal, however, are somewhat different. They are about whether jurors have pre-existing, personal standards for a determination of guilt, such as requiring DNA or fingerprint evidence, beyond what the law itself requires. Thompson's counsel failed ·to object to most of these questions, waiving all but plain error.[56] More importantly, Thompson totally fails to establish that the questions violated his right to a fair trial or were unfairly prejudicial to him.[57]

¶ 34 In Proposition VII, Thompson first argues that the "constant reference to gang membership [during his trial] was irrelevant and prejudicial." This argument is untenable, since the gang context of the current case was fundamental to understanding what happened and why it happened, *i.e.*, the defendant's motive for shooting an unarmed, fifteen-year-old boy, who was running away from him. Thompson also challenges a portion of the testimony of Detective Jeff Gatwood, who testified as an expert witness on gangs in Tulsa and their activities in the area where Anthony was shot. Gatwood at one point described a 2004 incident in the

same area, in which a black female associated with the Hoover Crips shot and robbed a white male who was riding a bike.[58] Defense counsel objected to the testimony as irrelevant, but the trial court admitted it, "for the limited purpose of determining an issue of motive." While it appears dubious that this testimony was relevant to any issue in the current case, Thompson again fails entirely to establish that he was prejudiced by it.[59] Hence this claim is rejected as well.

¶ 35 In Proposition VIII, Thompson challenges the trial court's refusal to instruct on the meaning of "reasonable doubt." This Court has repeatedly rejected such claims.[60] We see no reason to re-examine the issue here.

·¶ 36 In Proposition IX, Thompson raises a cumulative error claim. This Court found error in Proposition I and is reversing Count III based upon this error, which fully resolves this issue. We have not found error regarding any of Thompson's other claims. Hence we need not address the "cumulative effect" of the other errors alleged.[61]

¶ 37 Finally, in Proposition X, Thompson argues that his first-degree murder sentence of life without parole is excessive and asks this Court to modify his sentence to life with the possibility of parole, to run concurrently with his sentences on the other counts.[62] Thompson argues that such a sentence would allow him the possibility of some day being released from prison "long after his gang days (and presumably his threat to the community) are behind him." This argument could have been made to the

convictions alleged. Nevertheless, the State appears to acknowledge the convictions occurred.

55. *See* Rule 6, *Rules for District Courts of Oklahoma*, Title 12, Ch.2, App. (2006) ("Counsel shall scrupulously guard against injecting any argument in their voir dire examination and shall refrain from asking a juror how he would decide hypothetical questions involving law or facts.").

56. Thompson acknowledges that he could not find relevant authority in support of his claim.

57. Thompson likewise fails to establish ineffective assistance based on counsel's failure to object to most of the questions challenged on appeal, since he cannot show prejudice.

58. Gatwood testified that when the woman was confronted by a Tulsa police officer, she pointed

her gun at him, and the officer then shot and killed her.

59. Thompson fails to make any argument about how the evidence prejudiced him or violated his right to a fair trial.

60. *See, e.g., Harris v. State*, 2004 OK CR 1, ¶ 51, 84 P.3d 731, 750–52 (affirming trial court's refusal to instruct on meaning of "reasonable doubt" and noting Court has "long disapproved of attempts by the trial court to define reasonable doubt for the jury") (citations omitted).

61. *See Sanders v. State*, 2002 OK CR 42, ¶ 17, 60 P.3d 1048, 1051.

62. This Court is already ordering that Count III be reversed and dismissed with prejudice.

sentencing jury and the trial court. It is not a valid reason for this Court to conclude that Thompson's sentence, as imposed, is excessive. We decline Thompson's invitation to modify his sentence.

¶ 38 After thoroughly considering the entire record before us on appeal, including the original record, transcripts, briefs, and exhibits of the parties, we find that Count III must be reversed and dismissed, but that Thompson's convictions and sentences on Counts I and II are affirmed.

### Decision

¶ 39 Thompson's convictions and sentences on **Counts I and II** are hereby **AFFIRMED.** His conviction on **Count III,** however, is **REVERSED and DISMISSED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2007), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, P.J., C. JOHNSON, V.P.J., A. JOHNSON and LEWIS, JJ.: concur.