2012 OK CR 1

**Reginald Orlando MATHIS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–2010–137.**

Court of Criminal Appeals of Oklahoma.

Jan. 19, 2012.

**70**

Reginald Orlando Mathis, pro se at trial.

David Bedford, Assistant Public Defender, Oklahoma City, OK, Defendant's Standby Counsel at trial.

Matt Dillon, Assistant District Attorney, Oklahoma City, OK, attorney for State at trial.

Andreas T. Pitsiri, Appellate Defense Counsel, Norman, OK, attorney for appellant on appeal.

E. Scott Pruitt, Attorney General of Oklahoma, Lori S. Carter, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### *OPINION*

SMITH, Judge.

¶1 Reginald Orlando Mathis, Appellant, was tried by jury and convicted of Possession of Firearm After Former Conviction of a Felony, in violation of 21 O.S. Supp.2005, § 1283(A) (Count II); Possession of Controlled Dangerous Substance (Marijuana), under 63 O.S. Supp.2004, § 2–402(A) (Count

III); Possession of a Stolen Vehicle, under 47 O.S.2001, § 4–103 (Count IV); and Possession of Drug Paraphernalia, a misdemeanor, under 63 O.S.Supp.2004, 2–405(C) (Count VII), in the District Court of Oklahoma County, Case No. CF–2007–1941.[1] In accord with the jury verdict, the Honorable Kenneth C. Watson, District Judge, sentenced Mathis to imprisonment for 25 years on Count II, 15 years on Count III, and 5 years on Count IV, and a fine of $500 on Count VII, with the prison sentences all run concurrently.[2] Mathis is properly before this Court on direct appeal.[3]

¶2 On March 26, 2007, officers from the Oklahoma City Police Department's Springlake "IMPACT" unit executed a search warrant at a residence on N.E. 29th St., in Oklahoma City. Four people were in the home at the time, including Garnett Stoner, who answered the door and apparently lived in the home, Reginald Orlando Mathis, who also apparently lived in the home, and two other persons.[4] The officers were looking for Mathis, who was known as "Sleepy." Stoner stated that "Sleepy" was in the "back bedroom." Mathis was found and detained in a bedroom in the northwest corner of the home.

¶3 Two marijuana roaches were found in an ashtray on top of a two-drawer dresser in this same room, next to a digital scale. A plastic baggie containing 4.5 grams of marijuana was found in the top drawer of the same dresser. In addition, an Oklahoma "Non–Driver Identification Card" for Mathis and a dry cleaning receipt with his name on it were found in the same room.[5] While the

---

1. Although the Judgment and Sentence does not state whether any of Mathis' convictions were "after former conviction of two or more felonies," the record suggests that this was so. Mathis was also originally charged with Count I, Possession of CDS (cocaine base), and Count V, Knowingly Concealing Stolen Property. These charges were dismissed after Mathis' preliminary hearing. Counts VI and VIM in the Information involved only Mathis' co-defendant, Garnett Stoner, and were not mentioned or addressed at Mathis' trial.

2. At sentencing, Mathis was ordered to pay costs, fees, and a victim compensation assessment of $185. The trial court also ordered that Mathis be given credit for time served. As discussed in

Proposition VIII, Mathis' Judgment and Sentence does not record which counts were "after former conviction of two of more felonies," the trial court's costs/fees/assessment ruling, or that Mathis was to be given credit for time served.

3. None of Mathis' convictions are subject to the "85% Rule," under 21 O.S. Supp.2007, § 13.1.

4. The two other persons were determined not to be either residents or owners of the home, did not have any outstanding warrants, and were released at the scene and never charged.

5. The picture on Mathis' Oklahoma identification card and witness testimony both suggest that Mathis got the name "Sleepy" because he has droopy eyes, which make him look "sleepy."

room was being searched, Mathis made numerous statements, including acknowledging that it was his bedroom, pointing out his "weed box" in the corner of the room, and stating that he used the digital scale to weigh his marijuana.[6] The "weed box" did not contain any marijuana, but rather contained sandwich baggies, rubber bands, and Swisher Sweets cigars—the brown wrappings of which were consistent with the wrappings of the roaches found in the ashtray on the dresser.

¶ 4 A bundle of Wendy's restaurant gift cards was found in the bottom drawer of the two-drawer dresser, and a Texas vehicle tag was found beneath this drawer (when it was pulled out). A Dodge truck key was found in Mathis' left front pants pocket, which fit both the door and the ignition of a locked Dodge truck parked outside.[7] The Texas vehicle tag found in Mathis' bedroom, "33DMD3," was likewise an exact match to the Texas tag on the rear of this truck. The truck was parked so it faced the street, and the front tag had been removed. A computer search revealed that the truck had been recently stolen in Texas.[8]

¶ 5 The owner of the Dodge truck, Diana Richardson, testified at preliminary hearing, but did not show up at trial. The trial court declared her "unavailable" and allowed her earlier testimony to be read to the jury. This testimony established that the truck was stolen from a Kohl's store parking lot in Garland, Texas, on March 22, 2007. It had been left unlocked, and an extra key was inside the glove box. Richardson worked at a Wendy's restaurant, and Wendy's uniform hats were found in the truck; and Wendy's gift cards were found in the bedroom dresser. In addition, a Ruger Hi–Point 9–mm handgun was found in the center console in the front seat area of the truck, and eighty-five 9–mm bullets were found in a pantry near Mathis' bedroom. Richardson testified that the gun was not hers and that it was not in the truck when it was stolen.

¶ 6 In a post-arrest interview, Mathis admitted that the marijuana and scales found in the bedroom were his and that he knew the gun was in the truck, but claimed that a guy in the duplex next door, whose name might be "Jerome," loaned him the truck for a month. Mathis acknowledged removing the front tag from the truck and putting it in his room, because he thought the truck might be stolen.

¶ 7 In Proposition I, Mathis asserts that the trial court erred in allowing him to represent himself and that this error was "detrimental" to him.[9] The Supreme Court and this Court have recognized that a defendant has a constitutional right, under the Sixth Amendment, to represent himself at trial if he chooses to do so.[10] Both courts have also recognized that because the right

---

6. The search warrant was based upon evidence and allegations that Mathis was distributing crack cocaine at this address. No actual cocaine base was discovered during the search, though officers outside the home heard persons inside yelling, "Police!" and the sound of a toilet flushing, after the entering officers knocked on the front door and announced that they had a search warrant. Officer Jimmie Cortez, who searched Mathis' bedroom, testified that Mathis seemed to be directing him toward certain items, possibly to distract him from others, and that he repeatedly informed Mathis that he did not need to be talking.

7. Mathis, who represented himself at trial, was very focused on the fact that the Dodge truck was actually parked in the parking area for the residents of the *other* half of the duplex where the search was conducted—the half that had a separate address and was not searched—even though the key to the truck was found in his pocket.

8. Mathis cross-examined Cortez regarding the fact that his report listed a different tag, "33DM3T," for the recovered tag, which Cortez stated was simply a "clerical error" in his report. Cortez noted that a separate search of the Dodge truck's VIN number confirmed that the truck parked outside the duplex was indeed the same truck stolen out of Texas. In addition, two identical garage-door remote controls were found in the trash at the searched residence.

9. Mathis does not seek a new trial, however, but requests "a favorable modification of his sentences."

10. *See Faretta v. California*, 422 U.S. 806, 818–21, 95 S.Ct. 2525, 2532–34, 45 L.Ed.2d 562 (1975); *Parker v. State*, 1976 OK CR 293, ¶ 4, 556 P.2d 1298, 1300 ("*Faretta* established that a defendant has an independent fundamental right guaranteed by the Sixth Amendment ... to represent himself at all stages of criminal proceedings if he elects to do so.").

to the assistance of counsel is likewise a fundamental constitutional right, a defendant who desires to represent himself must first "knowingly and intelligently" waive the benefits of counsel, after being informed of "the dangers and disadvantages of self-representation." [11] And in order to validly waive the assistance of counsel and proceed *pro se*, a defendant must be competent to make this decision and must be clear and unequivocal in his desire to proceed *pro se*.[12] This Court has recognized that whether such a waiver is valid will be determined from "the total circumstances of each case." [13]

¶8 The Supreme Court and this Court have also recognized, however, that an "intelligent" decision to waive counsel and proceed *pro se* is not the same as a "smart" or well-thought decision. The issue is whether the defendant was adequately informed and aware of the significance of what he was giving up, by waiving the right to be represented by counsel. As this Court noted in 1976:

> The test whether a defendant has intelligently elected to proceed *pro se* is not the wisdom of the decision or its effect upon the expeditious administration of justice. It is only necessary that a defendant be made aware of the problems of self-representation so the record establishes that he understands that his actions in proceeding without counsel may be to his ultimate detriment.... [T]he defendant's technical

knowledge of the law and its operation at trial is totally irrelevant in the assessment of his knowing exercise of the right to defend himself.

*Johnson v. State,* 1976 OK CR 292, ¶34, 556 P.2d 1285, 1294 (citing *Faretta* ).[14]

¶9 Mathis was represented by court-appointed counsel at his preliminary hearing in August of 2007. Mathis' counsel requested that his competency be evaluated in February of 2008, and a competency evaluation was ordered at that time.[15] The competency evaluation was filed in the trial court in April of 2008 and concluded that there was no evidence that Mathis was incompetent, unable to appreciate the nature of the charges against him, a danger to himself or others, or that he suffered from "mental illness or cognitive deficits that would impair his ability to rationally consult with a lawyer and prepare his defense." [16] Mathis was found competent by the court on April 16, 2008.[17]

¶10 Mathis first requested to be allowed to "go *pro se* " on July 17, 2009, and a hearing was set on this request for July 22, 2009. Yet the record contains no evidence that this hearing was actually held. During a motion hearing before the Honorable Kenneth C. Watson, on November 16, 2009, Mathis again stated that he wanted to represent himself. Mathis was adamant that he did not want his then-appointed counsel, Erin Maxwell, to have anything to do with his case

**11.** *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541; *Parker,* 1976 OK CR 293, ¶¶5–6, 556 P.2d at 1300–01.

**12.** *See Fitzgerald v. State,* 1998 OK CR 68, ¶6, 972 P.2d 1157, 1162.

**13.** *Id.; see also Braun v. State,* 1995 OK CR 42, ¶12, 909 P.2d 783, 788 ("Whether there has been a valid waiver of right to counsel is to be determined from the total circumstances of the individual case[,] including background, experience and conduct of the accused.").

**14.** *See also Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541 (noting that defendant must be made aware of dangers/disadvantages of self-representation "so that the record will establish that 'he knows what he is doing and his choice is made with eyes wide open' " (citation omitted)).

**15.** This Court notes that the Supreme Court held, in *Godinez v. Moran,* 509 U.S. 389, 391, 113 S.Ct. 2680, 2682, 125 L.Ed.2d 321 (1993), that the

competency standard for waiving the right to counsel is *not* a "higher standard" than the competency standard for standing trial. *See also Fitzgerald,* 1998 OK CR 68, ¶6, 972 P.2d at 1162 (same).

**16.** The report noted that Mathis did not understand why his competency was being questioned and concluded that "the defendant apparently has an extensive history of involvement with the criminal justice system where his competency has never been an issue." The competency report notes that Mathis was already talking about representing himself at this time, that he was very confident in his ability to do so, and that he already had a specific strategy in mind.

**17.** Mathis does not point to any new or additional evidence in the record suggesting that a change in his mental state after this finding required a new determination of his competency.

and that he could "do better than what she been doing." [18] The trial court acknowledged Mathis' frustration with Maxwell—while maintaining that she was, in fact, "a good lawyer"—but emphasized that Mathis should understand (1) that Maxwell would no longer be his counsel, regardless of whether he chose to represent himself or not, and (2) that he should not underestimate the difficulty of representing himself.

¶ 11 Although the trial court stated that Mathis would get "a fair trial" in his courtroom whether or not he had counsel, the court advised Mathis that choosing self-representation would be "making a mistake" and noted that it took the attorneys and the court "years to familiarize ourselves" with the law that would apply to his case. The prosecutor likewise noted that Mathis needed to understand that he would be held to the same standards and rules as any attorney, even though he "doesn't know the rules" and "doesn't even know the different areas or stages of trial." [19] At the end of the hearing, Mathis announced that he wanted more time to prepare his case and agreed to January of 2010 for a hearing on his motions and a trial date. In addition, public defender David Bedford announced that he would answer Mathis' questions, help him file motions (including a motion to have his bond reduced), and communicate with the prosecutor's office for Mathis.

¶ 12 At the motions hearing on January 21, 2010, the court noted that Mathis had not filed any new motions, but that there were various motions at issue filed by Mathis' former counsel. After struggling mightily (and unsuccessfully) to address the issues at stake in these motions, Mathis indicated that he would like Bedford, who was there assisting him, to take over and be his "lead counsel." The court noted during this process that Mathis' confusion about how to proceed was why "it's bad for you to go pro se," how it was like "doing brain surgery" and "not knowing what you're doing," and that this was why defendants are advised "not to go represent themselves." Bedford then argued the motions at issue and won on a number of them. Bedford indicated that although it would be difficult, he could be ready to represent Mathis at trial, as scheduled, on Monday, January, 25,2010.

¶ 13 The very next day, however, Bedford sought a continuance, maintaining that he could not be adequately prepared to represent Mathis that quickly. At this point, Mathis clearly and unequivocally informed the court that he did *not* want a continuance, that he would rather represent himself and was prepared to do so, and that he would like Bedford to remain as his standby counsel. And the court agreed to proceed this way. Prior to the start of trial on the following Monday, the trial court reminded Mathis that he had no experience trying a case, that he was "going to be held to the same standards as a lawyer," and that he probably wasn't "going to like the results" of representing himself.[20] Mathis then represented himself at trial, with substantial assistance from his standby counsel, whom Mathis consulted with regularly and once referred to as his "assistant."

¶ 14 Mathis argues on appeal that the trial court did not properly comply with "the *Coleman* procedure" for evaluating a defendant's request to represent himself, *i.e.*, the procedure described in *Coleman v. State*, 1980 OK CR 75, 617 P.2d *243*. In particular, Mathis complains that he was not specifically warned that by representing himself, he would

18. Maxwell acknowledged during this hearing that Mathis had been found competent and that she did not know of any reason that he should not be allowed to represent himself.

19. The prosecutor's comment was based on Mathis' statement that he didn't even know what *"voir dire"* was. This Court notes that during this same hearing, Mathis had the assistance of a second public defender, Tim Wilson, who repeatedly advised and consulted with Mathis. Wilson noted that Mathis was interested in having standby counsel to assist him in representing

himself, that David Bedford was available to do so and was "enthusiastic about the process," that his office would provide Mathis with "a package" to assist him, and that their office would "have [Mathis] ready to go."

20. Mathis was also informed that the fact that there is a probable cause affidavit in the record that is not properly signed—a fact upon which Mathis was fixated and that Mathis had earlier referred to as "my most famous opinion"—was not going to matter or help Mathis' case at trial.

"waive any argument of incompetent counsel as a basis for appeal." *See id.* at ¶ 8, 617 P.2d at 246. Mathis also complains, citing *Coleman,* that "Judge Watson did not specifically explain that his 'lack of knowledge and skill as to rules of evidence, procedure and criminal law' would put him at an extreme disadvantage" (quoting *Coleman, id.*). Mathis fails to recognize that the law in this area has evolved in a number of ways since *Coleman.*[21]

¶ 15 In *Edwards v. State,* 1991 OK CR 71, ¶ 10, 815 P.2d 670, 673, we noted, "This Court has not imposed a laundry list of factors which the trial court must address when accepting a waiver of counsel, and we decline to do so now." And we have more recently affirmed that we will not "impose a list of factors" or specific warnings that must be checked off by the trial court in this context. *See Fitzgerald v. State,* 1998 OK CR 68, ¶ 6, 972 P.2d 1157, 1162. Rather, we will evaluate whether the defendant was adequately warned about the dangers of self-representation based upon all the circumstances of the case at issue, considering whether the defendant was made aware that this choice could quite likely work to his ultimate detriment. *Id.*

¶ 16 Mathis was adequately advised of the charges against him, the range of punishments at issue, the role that standby counsel would play if he chose to proceed *pro se,* that he did not know the rules and procedures by which the trial would be conducted, that it took lawyers and judges "years" to learn these rules, and that defendants are always advised not to represent themselves. Mathis was also specifically warned that he was "making a mistake," that it was "bad" to go *pro se* and similar to doing "brain surgery" without knowing how to do so, and that he probably would not like "the results" of his decision to represent himself. It should be noted that Mathis actually experienced how challenging and frustrating it could be to try to function as a lawyer—without ever going to law school or studying the law—during the motions hearing just prior to his trial. This experience temporarily caused Mathis to ask to be represented by counsel again, which was granted and to his advantage. The fact that Mathis *subsequently* chose to proceed to trial *pro se* strongly indicates that he made this final decision "with his eyes wide open." Although Mathis was not specifically told that by representing himself, he was giving up the right to claim ineffective assistance of counsel on appeal, this specific warning is not required by current law, nor did the failure to give this warning undermine the legitimacy of Mathis' decision.

¶ 17 This Court notes that in the current context, where providing standby counsel to a defendant who elects to represent himself is a common practice (of which we strongly approve), a defendant who chooses to represent himself is not necessarily totally giving up "the assistance of counsel."[22] Mathis represented himself at trial, but he also had very significant, repeated, and helpful assistance from his standby legal counsel. In this context, when a defendant who proceeds *pro se* makes this choice *knowing* that he or she will still have "assistance" from trained legal counsel, it makes little sense to impose the entire *Coleman* list of[23] specific "warnings"

21. Mathis also cites *Coleman*'s finding that "[c]ompetency to stand trial and competency to proceed *pro se* are not synonymous," *see Coleman,* 1980 OK CR 75, ¶ 7, 617 P.2d at 246, and argues that the higher standard in the *pro se* context required the trial court to conduct an additional competency determination and a "more thorough inquiry" regarding his ability to proceed *pro se.* As discussed *supra* in note 15, however, the competency standard is not higher in the *pro se* context. Hence an additional and "more thorough" competency inquiry was not required.

22. In the capital context, this Court ruled, in *Lay v. State,* 2008 OK CR 7, 179 P.3d 615, *abrogated on other grounds by Harmon v. State,* 2011 OK CR 6, ¶¶ 57–58, 248 P.3d 918, 938–39, that in cases subsequent to *Lay,* we would "require that the trial court appoint standby counsel in all capital cases where an indigent defendant is representing himself/herself," and that "such standby counsel shall be present at all court proceedings to assist the defendant in self-representation but allow the defendant to maintain control of the case." *Id.* at ¶ 9, 179 P.3d at 620.

23. For example, the *Coleman* requirement that a defendant be warned "that the trial court is not required to appoint standby counsel," *see* 1980 OK CR 75, ¶ 8, 617 P.2d at 246, makes no sense where the trial court has announced that the defendant *will* be given standby counsel.

invoked by Mathis. Rather, the "intelligence" and informed nature of the defendant's decision to proceed *pro se* is evaluated based upon the "total circumstances" of the case.[24]

■ ¶ 18 This Court does not address Mathis' Proposition I assertions regarding ways in which he failed to do a good job of representing himself, nor do we address the State's counter-assertion that "it cannot be overlooked that Defendant did a very good job representing himself at trial." A defendant's actual performance as his own counsel is irrelevant to the determination of whether the trial court abused its discretion in allowing that defendant to exercise his constitutional right to represent himself.[25] This Court notes that Mathis does not even *seek* a new trial, where he could be represented by counsel. He asserts that his "inability to articulate his case or make proper objections" resulted in higher *sentences* than he would have been given if he had been represented by counsel and seeks a sentence modification. We conclude that the trial court did not abuse its discretion in allowing Mathis to represent himself at trial. Proposition I is rejected accordingly.

¶ 19 In Proposition II, Mathis challenges the trial court's decision to allow Diana Richardson's preliminary hearing testimony to be read to the jury at trial, after declaring her "unavailable" when she did not show up for trial. Neither Mathis nor the State recognizes the very significant developments in the law in this area in recent years, nor does either party even cite the seminal case of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* emphasized that a defendant's right to cross-examine the witnesses against him is the centerpiece of the Sixth Amendment's confrontation right.[26] And the use of preliminary hearing testimony in a criminal trial is the kind of "testimonial hearsay" that *Crawford* recognized as being subject to two fundamental Sixth Amendment requirements: (1) the witness must be unavailable, and (2) the defendant must have had a prior opportunity to cross-examine the witness.[27]

■ ¶ 20 Mathis challenges only the trial court's determination that Richardson was "unavailable" at trial, under 21 O.S.Supp. 2002, § 2804. With the help of his standby counsel, Mathis did object to the trial court's ruling that Richardson was "unavailable." Hence the issue has been preserved, and we will review the trial court's finding in this regard for an abuse of discretion.[28]

¶ 21 The State subpoenaed Diana Richardson, and the record supports the State's assertions at trial that it expected her to appear. The prosecutor discussed her expected arrival time at a sidebar conference during voir dire and told the jury during opening statement, "You're going to hear from the owner of that truck, a person out

24. *Fitzgerald*, 1998 OK CR 68, ¶ 6, 972 P.2d at 1162; *Braun*, 1995 OK CR 42, ¶ 12, 909 P.2d at 788.

25. *See Nave v. State*, 1991 OK CR 42, ¶ 15, 808 P.2d 991, 993–94 ("It is true that the appellant functioned adequately. However, this is not the test of a valid waiver of the constitutional right to counsel."); *Parker*, 1976 OK CR 293, ¶ 9, 556 P.2d at 1301 (review for abuse of discretion).

26. The *Crawford* Court wrote:

To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination....

Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is so obviously guilty. This is not what the Sixth Amendment proscribes.

541 U.S. at 61–62, 124 S.Ct. at 1370–71; *see also Thompson v. State*, 2007 OK CR 38, ¶ 20, 169 P.3d 1198, 1205 (recognizing and summarizing *Crawford*).

27. 541 U.S. at 68, 124 S.Ct. at 1374 ("Where testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Although the *Crawford* Court declined to adopt a precise definition of "testimonial," it specifically found that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing...." *Id.* at 68, 124 S.Ct. at 1374; *see also Thompson*, 2007 OK CR 38, ¶ 20, 169 P.3d at 1205 (finding *Crawford* test applies to use of preliminary hearing testimony in criminal trial).

28. *Id.* at ¶ 19, 169 P.3d at 1205.

of Texas who's going to be here tomorrow to tell you about when her truck was stolen and that she did not give the truck to Mr. Mathis." During the morning trial break the next day, however, the prosecutor asked that Richardson·be declared "unavailable." He noted that she had appeared at preliminary hearing, maintained contact with his office, acknowledged receipt of the subpoena, and told their witness coordinator the previous week that she could be at trial, though she didn't want to come. The prosecutor noted that Richardson left a message for him the previous Friday, asking if she still needed to come, and that he called her back and left a message that she did need to come. The prosecutor noted that he had called Richardson's employer that very morning and was told that she had, in fact, taken off work that day, but that Richardson was not responding to the State's attempts to reach her on either her cell phone or at home.

¶ 22 The State offered to stipulate that Richardson's testimony would be that her truck was stolen in Garland, Texas, on March 22, 2007, that Richardson did not know Mathis and did not give him permission to use her truck, to the content of the Texas vehicle tag that was on the truck, and that Richardson worked at Wendy's and had items related to Wendy's in her truck. The trial court found that Richardson was indeed "unavailable" and informed Mathis that if he would not agree to the proposed stipulation, the court would allow her preliminary hearing testimony to be read to the jury. Mathis, acting *pro se*, would not agree; hence Richardson's prior testimony was read before the jury.

¶ 23 This Court finds that the trial court did not abuse its discretion by declaring Richardson unavailable and allowing her earlier testimony to be read at trial. We further find that Mathis had an adequate opportunity to cross-examine Richardson at preliminary hearing and that this cross-examination, which was conducted by counsel, was extensive. We note too that Richardson's testimony is not the sort that could reasonably be expected to change in any significant respect between the time of preliminary hearing and trial. Proposition II is rejected accordingly.

¶ 24 In Proposition III, Mathis asserts that the prosecutor committed misconduct during his trial, which deprived him of a fair trial and contributed to his excessive sentences. Mathis raises the following claims: (1) the prosecutor vouched for State witnesses; (2) the prosecutor improperly accused Mathis of deceiving the jury; and (3) the prosecutor invoked societal alarm. This Court must determine whether the challenged actions rendered Mathis' trial fundamentally unfair, such that the jury's verdict cannot be relied upon.[29] Mathis acknowledges that he totally failed to object at trial to the actions now challenged on appeal. Thus we review the current claims only for plain error.[30]

¶ 25 In his "vouching" claim, Mathis complains that during closing argument, the prosecutor referred to Officer Jimmie Cortez as a "long-time veteran officer" and argued to the jury that it would be silly to think that the police officers "came in here and made all that stuff up" about finding roaches in Mathis' room.[31] The prosecutor's remarks, however, clearly did not amount to impermissible "vouching" under Oklahoma law.[32] The de-

29. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *see also Brewer v. State*, 2006 OK CR 16, ¶ 13, 133 P.3d 892, 895.

30. *Matthews v. State*, 2002 OK CR 16, ¶ 38, 45 P.3d 907, 920.

31. Within this argument the prosecutor stated that if jurors wanted to believe the officers lied, "that's your prerogative, but I will tell you, if you weigh out the evidence and you go back, and

look like you've listened to, there is no reasonable way you come up with that verdict."

32. *See, e.g., Nickell v. State*, 1994 OK CR 73, ¶ 7, 885 P.2d 670, 673 ("Argument or evidence is impermissible vouching only if the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony.").

scription of the officer as a "long-time veteran" is not even questionable. And although the challenged argument about whether police officers would simply make stuff up does contain the phrase, "I will tell you," which is unfortunate (and ill-advised) phrasing, the prosecutor's actual argument does not suggest that he is making any kind of statement or reassurance regarding his *own* belief in the credibility of the testifying officers. Thus it did not amount to vouching.

¶ 26 In his second claim, Mathis challenges the following portion of the prosecutor's final, first-stage closing argument, in which he essentially mocked Mathis' defense at trial, for challenging things that were well-established (in the State's view) by objective evidence and testimony presented at trial:

[I]f [Mathis] were to come in here and admit all that to you today, there wouldn't be much to talk about upstairs, would there? So, of course, he's got to say that stuff didn't really happen, because if he admits it really happened exactly how every witness told you it did, he's guilty.

Mathis cites cases in which this Court noted that it is improper to call the defendant "a liar." [33] However, the prosecutor's statement did not amount to improper name-calling; and Mathis did not even testify at trial. Hence his credibility as a witness was not at issue. The prosecutor's argument was about the weakness of Mathis' defense at trial, which was presented *pro se*, and the argument was well within the wide range of advocacy permitted at trial.[34]

¶ 27 In his "societal alarm" claim, Mathis challenges the prosecutor's sentencing-phase argument that the jury should consider the fact that Mathis had four prior felonies and had now committed three new ones. The prosecutor then argued, "At what point do you tell Mr. Mathis that we are tired of seeing him here? That he shouldn't have a stolen truck, he shouldn't have a gun. He is a felon. He's a multiple time felon." The prosecutor noted that Mathis was about 39 years old and argued, "I suggest to you that this should be the last time that we see Mr. Mathis in here...." This Court finds that the prosecutor's arguments were based upon the specific facts before the jury regarding Mathis, rather than suggesting that the jury should punish him for larger societal problems or that the jury should "send a message" to the broader public about the case.[35] Hence the prosecutor's argument did not invoke societal alarm. This Court finds that none of the remarks raised on appeal constituted prosecutorial misconduct. There was certainly no plain error. Proposition III is rejected accordingly.

¶ 28 In Proposition IV, Mathis asserts that Officer Cortez's reference to "cocaine manufacturing" during his testimony constituted an evidentiary harpoon.[36] Again, since Mathis did not object at trial, we review only for plain error.[37] This Court need not labor over the various elements of what constitutes a true "evidentiary harpoon" in the context of this case.[38] One required element of such a "harpoon" is that it was "prejudicial to the rights of the defendant on trial." [39]

**33.** *See, e.g., Smallwood v. State,* 1995 OK CR 60, ¶ 37, 907 P.2d 217, 229.

**34.** *See, e.g., Matthews,* 2002 OK CR 16, ¶ 38, 45 P.3d at 920.

**35.** *See McElmurry v. State,* 2002 OK CR 40, ¶¶ 151–52, 60 P.3d 4, 34 (contrasting the "prohibited 'societal alarm' argument" and the "'make an example' out of the defendant to deter other potential criminals" argument with permissible argument based upon the defendant's own actions and appropriate punishment for these actions).

**36.** The challenged reference occurred during Cortez's testimony in response to the question, "What other items did you locate in this room [Mathis' bedroom] that are drug related?" Cortez responded, "Sandwich baggies, digital scales, rubber bands. There's baking soda powder, which is a cutting agent commonly found in cocaine manufacturing. Those are just different items that you would normally associate as drug paraphernalia."

**37.** *See Torres v. State,* 1998 OK CR 40, ¶ 25, 962 P.2d 3, 13

**38.** *See, e.g., Bruner v. State,* 1980 OK CR 52, ¶ 16, 612 P.2d 1375, 1378–79 (listing six features of what constitutes an "evidentiary harpoon").

**39.** *Id.*

¶ 29 Although the original search warrant was based upon evidence that Mathis was distributing crack cocaine at the address searched, no cocaine base was discovered during the search; none of the charges at trial involved cocaine; and the quoted answer was the *only* reference to cocaine in connection with the current charges during Mathis' entire trial. And nothing in the State's closing arguments at trial even hinted that Mathis was involved with cocaine.[40] Hence this Court finds that the solitary and isolated reference to cocaine manufacturing within Cortez's answer did not prejudice Mathis in regard to his convictions or his sentences. There was certainly no plain error. Proposition IV is rejected accordingly.

¶ 30 In Proposition V, Mathis challenges one of the documents used to establish one of his prior convictions. During the second stage of his trial, the jury learned that he had a 1994 conviction for second-degree burglary. This conviction was used in support of Mathis' Count II conviction for Possession of Firearm After Former Conviction of a Felony. In the third stage of his trial, the sentencing stage, Mathis' jury learned that he also had a 1998 conviction for Possession of a Controlled Dangerous Substance, a 1994 conviction for Grand Larceny, a 1994 conviction for Escape from Custody, and a 1994 conviction for Bail Jumping. Mathis stipulated to these four convictions (from three cases), and a Stipulation listing these convictions and the date, county, and case number for each was entered into evidence at trial.[41] In addition, Mathis stated that he had no objection to the judgment and sentences from these three cases being entered into evidence, and these documents were entered into evidence without any redactions.[42] Mathis now complains that the Judgment and Sentence for his 1998 conviction for Possession of CDS lists his sentence as imprisonment for ten (10) years, from which his jury could infer—based upon the timing of the crimes charged at trial, *i.e.*, March 26, 2007—that he did not serve his full sentence. Mathis did not request redaction or object to this document at trial. Hence we review only for plain error.

¶ 31 Mathis cites no authority establishing that the failure to redact his sentence from the judgment and sentence document was error. This Court has held that a certified copy of a judgment and sentence document is an appropriate method of proving a defendant's prior conviction(s).[43] This Court does not accept Mathis' assertion that the mere listing of his earlier sentence improperly invoked the concept of parole before his jury. This Court finds neither error nor plain error in this regard. Proposition V is rejected accordingly.

¶ 32 In Proposition VI, Mathis asserts that his sentence in this case should shock the conscience of this Court and lead us to grant a modification of his sentence. In Proposition VII, Mathis likewise asserts that the "cumulative effect" of the errors at his trial should cause this Court to modify his sentence.

¶ 33 The jury was instructed that based upon Mathis having two or more prior convictions, which he admitted, the sentencing range for Counts II and IV was imprisonment for 3 years to life and that the range on Count III was imprisonment for 6 years to life. Hence Mathis' sentences of imprisonment for 25 years on Count II, imprisonment for 15 years on Count III, and imprisonment for 5 years on Count IV are all well within the ranges for each of these crimes—and were significantly below the maximum sentence of life for each. In addition, the trial court ran these three counts concurrently. Mathis' sentences do not shock the conscience of this Court.[44] Furthermore, since

---

40. Although the jury did learn, during sentencing, that Mathis had a prior conviction for cocaine possession, the State did not emphasize this fact or link it to the baking powder.

41. The 1994 convictions for Grand Larceny and Escape from Custody were from the same case.

42. Although the Stipulation does not list what drug was involved in Mathis' Possession of CDS

conviction, the actual Amended Judgment and Sentence notes that the drug was cocaine.

43. *See, e.g., Sanders v. State,* 1985 OK CR 110, ¶ 6, 706 P.2d 909, 911.

44. *See, e.g., Watts v. State,* 2008 OK CR 27, ¶ 10, 194 P.3d 133, 137.

this Court has not found any error among the claims raised herein, Mathis cannot succeed on his claim of cumulative error.[45]

### DECISION

¶ 34 Mathis' **CONVICTIONS** and **SENTENCES** on Counts II, III, IV, and VII are hereby **AFFIRMED.** This case is **REMANDED,** however, for correction of the Judgment and Sentence document, through an order *nunc pro tunc* by the district court, to reflect that Mathis shall be given credit for time served and to accurately reflect which counts, if any, were after former conviction of two or more felonies. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, P.J., LEWIS, V.P.J., C. JOHNSON, J.: concur.

LUMPKIN, J.: concur in results.

LUMPKIN, Judge: Concur in Results.

¶ 1 I concur in affirming the judgment and sentence but write separately to address the following.

¶ 2 The opinion professes to apply a plain error analysis in Propositions III, IV, and V. However, in Propositions III and IV, only lip service is paid to the standard of review adopted by this Court. In *Hogan v. State,* 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923, this Court said:

> To be entitled to relief under the plain error doctrine, Hogan must prove: 1) the existence of an actual error (i.e., deviation from a legal rule); 2) that the error is plain or obvious; and 3) that the error affected his substantial rights, meaning the error affected the outcome of the proceeding. *See Simpson v. State,* 1994 OK CR 40, ¶¶ 3, 11, 23, 876 P.2d 690, 694, 695, 698; 20 O.S.2001, § 3001.1. If these elements are met, this Court will correct plain error only if the error "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings" or otherwise rep-

resents a "miscarriage of justice." *Simpson,* 1994 OK CR 40, ¶ 30, 876 P.2d at 701 (citing *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993)); 20 O.S.2001, § 3001.1.

¶ 3 In a plain error review of claims of prosecutorial misconduct, this Court will grant relief only where the prosecutor's misconduct is so flagrant and so infected the defendant's trial that it was rendered fundamentally unfair. *Jones v. State,* 2011 OK CR 13, ¶ 3, 253 P.3d 997, 998. *See also Romano v. State,* 1995 OK CR 74, ¶ 54, 909 P.2d 92, 115 (when reviewing claims of prosecutorial misconduct for plain error, this Court "look[s] at the entire record to determine whether the cumulative effect of improper comments by the prosecutor prejudiced Appellant, constituting plain error"). In Proposition III, Appellant has not shown that the prosecutor's tactics or argument were fundamentally unfair. Therefore, there is no plain error.

¶ 4 In Proposition IV, the challenged testimony does not meet any of the requirements for an evidentiary harpoon. *Bruner v. State,* 1980 OK CR 52, ¶ 16, 612 P.2d 1375, 1378–1379. Therefore, the testimony was not error and there can be no plain error.

¶ 5 Further, I continue to disagree with the practice of setting forth the law in footnotes. *See Taylor v. State,* 2011 OK CR 8, 248 P.3d 362, 380 (Lumpkin, J., concurring in result); *Jackson v. State,* 2006 OK CR 45, 146 P.3d 1149, 1168 (Lumpkin, V.P.J., concurring in result); *Cannon v. State,* 1995 OK CR 45, 904 P.2d 89, 108 (Lumpkin, J., concurring in result).

In law review pieces, all citations appear in footnotes appended to the portions of the text to which they refer." *The Bluebook: A Uniform System of Citation* 45 (Columbia Law Review Ass'n, et al. eds., 18th ed. 2005). However, in "practitioner's documents" citations are "inserted into the text in one of two ways: as a stand-alone citation sentence or as a citation clause." *Id.,* at 3, 45. In court opinions, the law is

45. *See, e.g., Jones v. State,* 2009 OK CR 1, ¶ 104, 201 P.3d 869, 894.

generally set forth in the text. *Cannon v. State,* 1995 OK CR 45, ¶ 2, 904 P.2d 89, 108 (Lumpkin, J., concurring in result) ("While there are exceptions, statements in footnotes are generally regarded as dicta, having no precedential value.") *citing Wainwright v. Witt,* 469 U.S. 412, 422, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985) (In determining statements in footnote to be dicta, Court notes it had on other occasions rejected language from a footnote as "not controlling."); *McDaniel v. Sanchez,* 452 U.S. 130, 141–42, 101 S.Ct. 2224, 2232, 68 L.Ed.2d 724 (1981); *Henderson v. Morgan,* 426 U.S. 637, 651, 96 S.Ct. 2253, 2260, 49 L.Ed.2d 108 (1976) (White, J., with whom Stewart, Blackmun, and Powell, JJ., join, concurring). The use of footnotes to state the law or attempt to set out the law in this Court's opinions leads to confusion as to what is controlling precedent. Opinions are not law review articles and must be written to give clear and consistent interpretations of the law. This policy ensures the public is given notice of what the law is and trial practitioners of the bench and bar are able to confidently apply it.

*Taylor,* 2011 OK CR 8, 248 P.3d at 380 (Lumpkin, J., concurring in result).

¶ 6 Judicial opinions should be concise and to the point, analyzing the law in plain clear language that can be easily understood by all who read it. Footnotes should be used sparingly. Holdings of this Court should not be relegated to footnotes where they could be viewed as mere dicta. Matters necessary to the resolution of the question presented on appeal should be included in the body of the opinion. I believe we better serve the bench and bar by writing opinions which follow this basic recipe.